24-2059 and 24-2093. And we have Ms. Atkins, I see you've reserved two minutes for rebuttal. That's correct. You may begin whenever you're ready. Thank you, Your Honor. Good morning, and may it please the Court. Siobhan Atkins from the Federal Defenders of New York on behalf of Appellant Lupito Ramirez Rodriguez. All agree that then lawful permanent resident Mr. Ramirez Rodriguez was wrongfully removed from the country in 2000 based on a crime that did not warrant removal. But even though he would not have been removed but for that error, after all the error was removing him for a crime that did not warrant removal, the Court below found that Mr. Ramirez Rodriguez could not show prejudice arising from the error. That's because, the Court held, he was independently removable because of crimes that long postdated the disputed deportation proceeding. And those crimes were illegal reentry convictions that he would not have sustained had he been rightly permitted to stay in the country all along. This was wrong for several independent reasons. It's wrong as a temporal matter. Under this Court's decision in Scott, a court evaluating prejudice under 132060 must look to what was true at the time of the disputed deportation proceeding, which here occurred in 2000. It's wrong as a substantive matter. Those later illegal reentry convictions are not aggravated felonies that could independently support removal when they're predicated for removal for a crime that is not itself an aggravated felony, as all agree was the case here. And it's wrong as a matter of common sense. Even if the Court could consider those later illegal reentry convictions, Mr. Ramirez Rodriguez was still prejudiced because he would not have sustained those convictions but for the original error in wrongfully removing him. And because the prejudice holding was the sole basis for the Court's denial of Mr. Ramirez Rodriguez's motion to dismiss, this Court should vacate and remand. And you're asking us to remand and not to consider in the first instance the other two prongs of the test. Is that right? That's correct. That's for a number of reasons. I mean, first, that's this Court's default rule. This Court is disinclined to address matters in the first instance that the district court did not address below. But that rule also applies with particular force here for a number of reasons. So, first, after the district court rendered its decision, this Court issued its order in Gutierrez Compos, which clarified that before a court analyzes whether the waiver of administrative remedies and judicial review is knowing and voluntary under this Court's precedent in SOSA, the court must first analyze whether administrative remedies were available as a statutory matter. That's inherently a fact-specific inquiry that depends on the specific facts of a specific case. That's an inquiry that the district court is best poised to conduct in the first instance. Whether it was available? Is that what you're saying? That's correct. Meaning the appeal to the BIA? So the word available appears at two points in the statute. There's D-1, which asks whether a defendant has exhausted administrative remedies that were available, meaning appeals to the BIA. But it also appears in D-2, which asks whether judicial remedies were unavailable. All right. But he didn't even take the first step. He didn't even take the first step of appealing to the BIA. Right. That's correct. He did not. But this Court has never held that simply failing to take that first step, either renders the waiver of that step knowing and voluntary, or this Court has not yet analyzed what it means for a remedy, an administrative remedy, to be unavailable. There's precedent in other contexts about how even if a remedy is technically available, a defendant may have been thwarted from pursuing it, including in situations where he's effectively given official misadvice as to the availability or the procedures or, in some cases, his right to or his availability of pursuing it. Did anyone tell him it wasn't available? Here, the I.J. never informed the pro se, Mr. Ramirez-Rodriguez, about voluntary departure, and, in fact, wrote on his deportation order that voluntary departure was not – he was not eligible for that belief under this Court's precedent. Voluntary departure would have been what? Remind me. Yes. So if he had been eligible for voluntary departure, that meant that he could have – he would have had to leave the country, but he would – So it could have caused a readmission. Yes, exactly. And, importantly, in the circumstances of this case, he would not then be liable for illegal reentry because he would not have been subject to an order of removal. So what do we do with Palomar-Santiago? So, as a first instance, I mean, Palomar-Santiago, again, goes to D-1 and D-2, which the district court did not address. And there are many cases in the pipeline where district courts have grappled with the impact of Palomar-Santiago, have applied it to the specific facts of a specific case, have conducted factual inquiries to help inform whether Palomar-Santiago does, in fact, apply in that specific case. And they don't have to do it yet, is what you're saying. Exactly. Exactly. You know, the Court will have many opportunities to do that, and this is not the case because the Court only decided this on D-3, which, again, is fundamental procedural error. It decided that wrongly. And so the proper course of action would be to vacate and remand for the district court to fix its error, and, again, relying on convictions that postdated the disputed removal proceeding, and also in relying on convictions that were directly traceable to that error in the first — in any event. And then at that point, the district court can conduct a factual — again, the intensive in determining whether a remedy is available as a statutory matter or whether that waiver of that remedy is knowing and voluntary. Let me be — I want to be elusive on this. Exactly what relief will you be asking if you get a remand? What would you be asking the Court to look into? We would be asking for dismissal of the illegal reentry indictment because it — you Well, what factual findings, as opposed to legal conclusions, surround that? As to whether or not — as to whether or not there's a valid removal order? Well, in order to get to the — in order to get to the substantive validity of a removal order, the district court has to first conduct a gatekeeping inquiry as to whether or not remedies — a gatekeeping inquiry as to whether or not remedies were — you know, whether or not administrative remedies were available in the first instance. Is that a fact question? It can be a mixed question of fact and law, right? You know, it hinges on what a noncitizen's — under this Court's precedent about, you know, affirmative misadvice in the immigration context, it can turn on, you know, what a noncitizen knew or understood at the time. As it comes to B2, which is about, again, availability, but availability of judicial remedies, courts have long said — this Court has long said that a short period of time between when a noncitizen, you know, is able to pursue habeas relief, which would be the judicial relief available to him in 2000, and when he's deported, can make judicial relief unavailable as a practical matter. Well, don't you know what that interval was? Well, yes. I mean, there was a — however, there was a dispute at the district court level about the practical availability of habeas relief under that period of time. So what we say is that there was only a period of 11 days in between when Mr. Ramirez-Rodriguez was placed in Federal custody and when he was deported. That is not a practical — a noncitizen has no practical availability to see if he can get a lawyer to file a habeas petition and then get relief on that petition in that 11 — in that 11-day period. The government said below, however, that even if he was only in Federal custody for 11 days, he was in State custody. And so he had the — he had the ability to foresee that he could pursue, you know, federal habeas relief once — if and when he was placed in Federal custody. So it's all to say that this is a bit of a disputed — even though it ultimately turns on a legal question, there are disputed predicate facts that all need to be hashed out at the district court level. When you say hashed out, I mean, that's sort of a colloquial — Yeah, yeah, yeah. Pardon me. What's — is he going to take testimony? Well, oftentimes, defendants present affidavits, and, you know, the district court could request it if it — if it wants to get into, you know — for example, when he was in custody, was Mr. — when he was in State custody, was Mr. Ramirez-Rodriguez You've recited all those facts. Well, no — oh, I'm sorry, Your Honor. I just want to say, like, when he was in State custody, was he in solitary confinement? Was he able to pursue, you know — was he able to pursue counsel for a habeas petition and investigate his options, even though he wasn't practically able to file a habeas petition in the first place? Those would all be facts that the district court could evaluate and assess in deciding whether judicial review was available. Didn't he have time? Now, he was — he left the first time. He left. That's right. He was deported. Okay. Removed. Yes. He still could have appealed to the BIA, couldn't he? I'm not — I'm not sure about the practical availability of appealing to — perhaps he could. But, again, this Court has never said that whether or not a noncitizen has the practical ability to appeal to the BIA necessarily means that, A, those remedies were available in the first instance. A noncitizen could be effectively thwarted from doing so, right? That would make a remedy — If we think he could have, is that the end of the case? No, it's not. No, it's not. Why not? Because even if — and, you know, I think this Court's case in Calderon illustrates this principle well. Even if a noncitizen is fully informed that he has the right to appeal, and he knowingly and willingly — sometimes even with counsel, which was not the case here — decides not to appeal, that's not the end of the matter. Because if a noncitizen is affirmatively misadvised about the very availability of discretionary relief, which was the case here, that waiver could nevertheless be unknowing and involuntary. So perhaps, perhaps the Court could find under those circumstances that a remedy was available. I would dispute that because I think that the inquiries are related, right? Whether or not somebody is effectively thwarted from pursuing an appeal, I think, goes to availability question as a first place.  I mean, that's sort of a conclusion. But what do you mean by what thwarted him from going to the BIA? Yeah. So this Court has long held — I think Lopez maybe illustrates this. So those are cases. In this case, what thwarted him? Yes. He was not — an immigration judge has special duties to a pro se noncitizen. One of those duties is accurately informing that pro se noncitizen as to what — as to the fact that he may have discretionary relief available. In this case, voluntary departure. The immigration judge did not fulfill that duty here. That excuses failure to go to the BIA. Under this Court's case law, it does. And this Court has long so held, right? You know, when it comes to in Sosa, in Calderon, all of those cases where a noncitizen is not — either failed, you know, was not advised, or in this case affirmatively misadvised, which I think the principle holds even stronger in this case, as to the availability — as to the very availability of that discretionary relief, a waiver of administrative remedies is unknowing and involuntary. Counsel, can I just ask you a logistical question that you may need to look at in the break? Yeah. Throughout your brief, you cite something that is DE.1. I can't find that. So if you take a minute with your co-counsel, maybe, and when you get up on rebuttal, you can tell me where I can find that. Absolutely. I think I could clarify it right now. That's Docket Entry 1. Docket Entry 1. Yes, yes. Yeah, yeah, yeah. We thought it was Defense Exhibit 1. I'm sorry about that, Your Honor. No, that's okay. All right. Mr. Fang, you have 10 minutes in response. Good morning. May it please the Court, Jerry — my name is Jerry Fang, and I represent the government in this appeal and in the proceedings before the district court. This Court should affirm the judgment of conviction because the defendant had been removed from the United States while an order of removal was outstanding. It wasn't valid. It was illegal. Well, Your Honor, with respect to the removal order, 1326 isn't a self-executing statute, and the order has to be successfully challenged, collaterally challenged for it to be invalid. And with respect to that order of removal, Your Honor, even if there was a procedural defect in the initial underlying removal order, that removal order was reinstated in 2010 and 2016. And in those reinstatements, did he have the opportunity — what was his opportunity to challenge them? What process did he have? Because reinstatement, my understanding, is just, you know, the flick of a switch, and it exists. So, Your Honor, with respect to those two reinstatements, the defendant could have done a couple of things. First, as to each illegal reentry conviction, he could have filed exactly the same motion that he filed here, the motion under 8 U.S.C. 1326d to challenge the validity of the underlying removal order. And then with respect to the reinstatement, he could have challenged the validity of the reinstatement in a filing under 8 U.S.C. 1252a5. That's actually what the Charlesville Court says, which is that 1252 is the proper procedural mechanism for challenging a reinstatement of the order. And so what we have here are three separate orders of removal. Well, Your Honor, with respect to those prior removal orders, I can't speak as to precisely the reason why they were reinstated versus— Well, you guessed. I mean, you studied the record. Your Honor, with respect to those prior removal orders, the understanding of the law at that time in a pre-minter world was that the defendant's underlying New York State drug conviction constituted an aggravated felony. And so oftentimes, as an administrative matter for efficiency reasons, removal orders are routinely, or not uncommonly, reinstated as a basis for removal. But the point here, the relevant point here, and I want to really highlight this point for the Court, is that there was no prejudice here resulting from the defendant's removals in 2010 and 2016. And I want to talk a little bit about— Help me understand that, because I hear you blossoming on that. Please. Your Honor, so just sort of turning back to the statute, the relevant statute of conviction, there are three requirements. First, there needs to be a deportation, a prior deportation pursuant to an order of removal that was outstanding. So we don't have that here? Well, Your Honor, we do have that here, because we have the two reinstatements. The two reinstatements of— Why did the reinstatements make the original order anything, I mean, not illegal? Your Honor, the relevant question here is whether or not there was prejudice at the time that those removal orders were reinstated. And those removal orders were— Wait. Why isn't it prejudice now? You're saying the question is whether there was prejudice at the time of the first reinstatement? That's our inquiry? So there's no prejudice now, and there's no prejudice in 2016, and there was no prejudice after the defendant pleaded guilty in 2009 in connection with the first illegal reentry conviction, because he was deemed to be not removable by virtue of those illegal reentry convictions. Those aggravated illegal reentry convictions in 2009 and 2013 are each independent predicates for purposes of the instant prosecution in the district court block. Wait. I don't understand that. The initial order was illegal. How did those subsequent events change that fact? Because the defendant never filed any collateral attack to the underlying removal order at that time. And he didn't challenge the validity of those orders and — or those reinstatements either under 13-2016. Does that make the initial removal legal? So we now know that the initial removal, he should not have been removed. And so perhaps a hypothetical may help. Let's say he was prosecuted for illegal reentry in 2009, and instead of pleading guilty to illegal reentry, he had filed a 13-2016 motion. He may well have been able to show prejudice at that point because he could have attacked — potentially successfully attacked the underlying validity of — or the validity of the underlying order. But that door had closed when he — So should he now bring habeas petitions alleging ineffective assistance of counsel and actual innocence of his prior convictions? It just — it feels like you're throwing up a lot of roadblocks that are — that suggest very complicated resolutions, as opposed to going back to what Judge Parker is referring to, which is the actual order that underlies all of this is wrong. Right. But the point, Your Honor, is that the defendant does not seek to challenge the validity of those prior illegal reentry convictions. And those prior illegal reentry convictions, which he does not challenge, serve as the predicates — They could serve as the predicates for new removal orders, right? But they haven't been used for that. They serve as the predicates for this illegal reentry prosecution. How? Because of the — of the Fifth Circuit's case. Well, but that's not binding on us. I understand that you find Huerta's persuasive. But the government could have chosen after, say, the first illegal reentry conviction, to initiate new removal proceedings and say, you have this new aggravated felony. We're therefore removing you. Then I think Mr. Ramirez-Rodriguez would have a problem. But it chose not to. It chose not to. And it can still do that. It could — it could come up with new removal proceedings now. But Scott says the fact that new removal proceedings were possible doesn't mean — you know, doesn't solve the government's problem if they didn't engage in them. Well, Your Honor, and on the Scott point, Scott is distinguishable from the facts here. And the procedural history in Scott is somewhat convoluted, but I'll try my best to pare it down. In Scott, the defendant had been convicted of certain state criminal offenses, and then he received a removal order in absentia. He then appealed that removal order to the BIA. And that appeal to the BIA was subsequently dismissed. And then the defendant was convicted of a misdemeanor for possessing burglar tools. And what this Court said in Scott was that the district court improperly considered the misdemeanor conviction in assessing prejudice because that set of facts occurred after the removal order. And here, the key distinction here is that there are multiple reinstatements of the removal order, and there are — All of which occurred after the removal order, just like in Scott. All of the facts on which you rely, just like in Scott, occurred after the initial defective removal order. That's correct, Your Honor. But the nuance is, in Scott, there was no intervening illegal reentry conviction. And that matters for purposes of prejudice because in Scott, there was no — We have limited time. Do you have a better case for Scott? Because I read Scott briefly and carefully, and it seems to me singularly unhelpful for your position. Your Honor, here, the illegal reentry convictions occurred before the reinstatements of the prior removal order. And the Court can properly consider the illegal reentry convictions in determining prejudice, that is, whether or not the defendant is removable, because — and that's precisely the reason why Scott is distinguishable, because there was no intervening illegal reentry conviction or any aggravated felony conviction that would have changed the prejudice analysis. Okay. So Scott is your best case. Is that what you're telling us? No, Your Honor. Scott is just not applicable here because of a factual distinction. Namely, here, we have intervening illegal reentry convictions that themselves serve as aggravated felony convictions. That's not present in Scott, and that's not present in the Ninth Circuit case and Arias-Fordonas, which the defense cites as well. If anything, Your Honor, Charleswell, which the defense cites, is probably the most on point out of the defense cases, because there, Your Honor, there was a reinstatement of a prior removal order, and Third Circuit — I'm remanded here. Your Honor, the government would be — Assuming hypothetically there's a — that's a hypothetical point. Setting aside the question of prejudice, Your Honor. If we argue prejudice, then what else? Also, that Palomar-Santiago is what controls this case, and that the defendant is not excused from satisfying the gatekeeping requirements of 1326d1 and d2, because he didn't exhaust his administrative remedies, and he didn't seek judicial review. And Judge Newman had asked, could he have appealed to the BIA? And he could have. He could have appealed the removal order to the BIA, and he could have sought a motion to reconsider as well in immigration court. And he did neither of those two things. He didn't seek judicial review either under 1252. And what Palomar-Santiago says is that even if a judge misadvises — an immigration judge misadvises the defendant as to his eligibility for removal or his eligibility for immigration relief, that is precisely the point of an appeal. And the fact of the incorrect advice does not render those remedies unavailable. Those remedies are still there, and he could have taken them, and the defendant ultimately didn't pursue those remedies at all. When did that time to appeal run? There are different time periods for each — each provision. But those all ran — those all ran a while ago. When did Mr. Rodriguez's time to appeal run? Your Honor, I believe he has 30 days for purposes of an appeal. 30 days from when? From the final removal order. What date is it? Give me a date, please. Are you talking about appeal to the BIA or appeal of the conviction? Appeal to the BIA is what I'm saying. Just a moment, Your Honor. Your Honor, those time periods would have all been around the year 2000, 2010, for purposes of taking an appeal or for seeking additional relief. Did he have counsel when he pled to either of the illegal entries? He did, Your Honor. He was — each of those illegal reentry convictions were actually in the Southern District of New York, and he was counsel for both. On a guilty plea? Correct. So he — Mr. Ramirez Rodriguez could have filed a 1326d challenge in each of those proceedings, and he chose to plead guilty, and he chose to allocute to his guilt as to the illegal reentry following an aggravated felony offense. All right. Thank you, counsel. Thank you. Counsel, you've reserved two minutes for rebuttal. Thank you, Your Honors. I'd just like to reiterate, I think, what Your Honors have expressed a few times, which is that this is not a particularly complicated case, as much as the government would like to make it so. The easiest way to resolve this case is just to say the sole ground on which the district court decided the case, which was prejudice under D-3, was in error because the court considered convictions that postdated the disputed deportation proceeding. The government says here that — and, you know, and then the court can address D-1 and D-2, exhaustion of administrative remedies and availability of judicial review on remand. And I just like to say that, you know, the government's entire argument for prejudice hinges now explicitly, which it didn't say as much in its briefs, that the 2010 and 2016 reinstatements could independently support removal when the underlying removal order that was reinstated was infirm. And that's simply — We don't have to spend any time on that. Are you talking about when he pled guilty, the charge to which he pled guilty? We are — we are talking about the removal order in 2010, that the reinstated removal orders cannot independently support the instant illegal reentry charge. Now, I take it Your Honor had some questions about why Mr. Ramirez-Rodriguez did not collaterally challenge the — No, I'm not asking about collateral at all. Okay. Yeah. He pled guilty to illegal entry. Yes. In 2009 — yes, in 2013. That's correct. And didn't try to vacate those convictions. So it's correct that he didn't — that we're not collaterally challenging those convictions in the way — If he's twice convicted of illegal entry, why isn't he now removable? Why is he not now removable as charged? Because the — because the only actual — Scott demands that the — when evaluating prejudice under D-3, the court must look to what was true at the time of the disputed deportation proceeding. Wait a minute. You already got into prejudice. Yeah. Doesn't the statute say that the guilty plea, that's an aggravated felony, is it? Well, we dispute that. We think that when an illegal reentry conviction is itself premised on removal for a crime, that is not an aggravated felony. But he pled guilty to it. He didn't raise all the interesting things you're raising now. He had a lawyer, and they said, you're charged with illegal entry. And he said, I'm guilty. Yes. So — Isn't that the end of the illegal entry? It's not. It's not. For a few reasons. Yeah. Why a guilty plea when it's represented by counsel? Because — so for a few things. So just as a practical matter, I want to be clear about what the effect a collateral — what the effect — say in 2009 or 2013, he had said, you know, actually I'm going to mount a 1326D challenge to this underlying removal order, right, which is what my adversary faults us for not — faults Mr. Ramirez Rodriguez for not doing. That would have the effect of requiring dismissal of the illegal reentry charge, but it would not have required a court — and a court could not simply void the underlying removal order. So to the extent that, you know, counsel or the court is concerned about general — But he hadn't done all those things. Mm-hmm. But he didn't. He pled guilty. That's correct, Your Honor. But he had — so it's all to say that the defective removal order, that is the predicate for this instant illegal reentry conviction.  It's still on the books. And it's not through no — The first removal order. That's correct. But — and I want to be clear, the later — when he was removed in 2010 and 2016, those were not new and independent determinations of removability. They were simply reinstatements of the original defective underlying removal order. So he's never been removed. Even though — even though he was potentially eligible for other reasons — Yes. Yes. He's never been removed — Yes. — other than based on the original — Exactly. Exactly. The government could have proceeded to conduct new deportation proceedings in 2010 and 2016. Based on that — Is he subject to those now? Hmm? Is he subject to those now? Could the government proceed to conduct new deportation proceedings now? I'm unaware if they're — if they've essentially, you know, waived that right. I'm unaware. Or if they — I don't know if they've — having proceeded down the path, if they could conduct new plenary deportation proceedings now. They might. Yeah. I mean, he's certainly still in custody. Yeah. I mean, that's not — it's certainly not the issue here because it's — the government didn't, right? And Scott makes clear that we can't — in evaluating prejudice, we can't evaluate a counterfactual world in which the government had conducted new plenary deportation proceedings. You're saying — you're saying he has not been found removable because of his convictions. That's — that's correct. All — his removal is all predicated on the 2000 — defective 2000 removal order. How do we know that? How do we know that? Well, because in order — I guess it kind of starts from first principles, right? So in order for the government to pursue an illegal reentry conviction — I think this might be a — Yeah. I don't want to answer it for you. Yeah, yeah. I think we're just asking, how do we know from the record that all of these removals are based on the initial removal? Yes. Right. I mean, that's a simple matter. It's simply a reinstatement. The government did not — and I — they don't — they do not dispute that they did not do this. The government did not conduct plenary deportation proceedings. At the point — at that point, the government could have said, Mr. Ramirez-Rodriguez has an illegal reentry conviction. That is an aggravated felony. Mr. Ramirez-Rodriguez could present defenses to that. The government did not do that. The nature of a reinstatement proceeding by statute simply asks, has a defendant, you know, previously been removed under a prior order? If he has, if he's the same person, that prior removal order is reinstated. So the previous basis for that — for that removal order is the exact same basis for why he's removed in 2010 and 2016. You're saying the only removal order existing is the original one.  That's correct. That's correct. And I think the government tries — you know, and I want to be clear because, of course, he was removed, but only based on the 2000 removal order. That's a yes answer, right? Yes. That's a yes answer. I don't want to make it more complicated than I need to. But, yes, it's a yes answer. He was only removed in 2000. Thank you. All right. Thank you, counsel. Thank you. Appreciate the help we got from counsel. All right.